David Bahr, OSB No. 901990
davebahr@mindspring.com
BAHR LAW OFFICES, P.C.
1035 ½ Monroe St.
Eugene, OR 97402
Tel: (541) 556-6439

*Local Counsel*

Jessica F. Townsend, TX Bar No. 24066205
*pro hac vice* application forthcoming
jessica@eubankslegal.com
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (202) 780-7286

William S. Eubanks II, DC Bar No. 987036
*pro hac vice* application forthcoming
bill@eubankslegal.com
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
Tel: (970) 703-6060

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PENDLETON DIVISION

| | |
|---|---|
| **THE CLOUD FOUNDATION**, a non-profit Colorado Corporation**, GINGER KATHRENS**, and **DENIZ BOLBOL**, | Case No.: 2:23-1154 |
| *Plaintiffs,* | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *v.* | **First Amendment of the U.S. Constitution, National Environmental Policy Act, Administrative Procedure Ac**t |
| **DEB HAALAND**, Secretary, Department of the Interior, in her official capacity, **TRACY STONE-MANNING**, Director, Bureau of Land Management, in her official capacity, **BARRY BUSHUE**, State Director, Oregon-Washington Bureau of Land Management, in his official capacity, and **WAYNE MONGER**, | |

Complaint – 1

District Manager, BLM Vale District Office, in
his official capacity,

     *Defendants.*

## INTRODUCTION

1.     This case challenges a decision of the Bureau of Land Management ("BLM")
seriously limiting public access to observe and document roundups of federally-protected wild
horses in the Three Fingers and Jackies Butte Herd Management Areas ("HMAs") in Oregon.
BLM decided to proceed with these highly controversial roundups despite its ordinary policy and
practice of offering only woefully inadequate, distant public viewing areas with poor visibility—
and sometimes no visibility to the public at all. At the same time, BLM deliberately ignored the
readily available, unobtrusive, and cost-effective alternative of real-time, high-definition cameras
placed in strategic locations, which would substantially enhance public access at no material cost
to BLM, while providing much better safety protections for BLM staff, its contractors, members
of the public, and wild horses and burros than BLM's adopted policy and practice.

2.     BLM's severe limitation on public observation of this government activity—a
restriction which does not serve any legitimate governmental interests that cannot be served by
alternatives that would substantially enhance public access—thwarts the important
newsgathering and public oversight objectives that Plaintiffs aim to achieve by observing and
documenting BLM's treatment of federally-protected wild horses, and thus violates Plaintiffs'
rights under the First Amendment of the U.S. Constitution.

3.     BLM's decision to conduct these roundups without any effort to address or
analyze whether existing measures for public observation are sufficient, including to satisfy the
public's rights under the First Amendment, must also be set aside because it is arbitrary,

capricious, and violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, its implementing regulations, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). This is especially so because Plaintiffs placed before BLM specific, detailed comments and substantial evidence requesting consideration of cost-effective alternatives that better promote transparency and public access while serving the government's stated objectives. BLM's failure to analyze these alternatives, let alone supply a coherent explanation for its refusal to do so, violates both NEPA and fundamental tenets of administrative law.

## JURISDICTION AND VENUE

4.      This case arises under the First Amendment of the U.S. Constitution, the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347, and the APA, 5 U.S.C. §§ 501-706.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), the APA, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

6.      Pursuant to 28 U.S.C. § 1391 and District of Oregon Local Rule of Civil Procedure LR 3, venue is proper in this Court because the agency actions, events, or omissions giving rise the claims occurred within this judicial district; the BLM Vale District Office that made the decision at issue is located in this district; and the environmental impacts to wild horses will occur in and impact this district. Assignment in this judicial division is proper for the same reasons.

## PARTIES

7.      Plaintiff The Cloud Foundation is a 501(c)(3) nonprofit organization headquartered in Colorado Springs, Colorado. It is dedicated to the preservation of wild horses and burros on public lands in the western United States, including Oregon. TCF has standing to

bring this action on behalf of its members in a representational capacity, and also has

organizational standing to bring this action both because this practice—which often deprives

TCF staff, members, and supporters of meaningful access to wild horse management activities

—frustrates TCF's core mission and because TCF is forced to drain its organizational resources

counteracting the unlawful practice challenged in this case.

8.      The Cloud Foundation's members and supporters enjoy viewing, studying,

photographing, and filming the natural behavior of wild horses in their natural habitats, free from

human interference, including in the Three Fingers and Jackies Butte HMAs. On behalf of its

supporters, The Cloud Foundation regularly comments on BLM's policies and practices

governing the management and treatment of wild horses, including BLM's wild horse roundups.

9.      The Cloud Foundation has participated in several federal lawsuits challenging

BLM's wild horse management practices. Particularly notable in the context of the instant matter

is a First Amendment and APA lawsuit that The Cloud Foundation brought in this Court, which

successfully thwarted BLM's proposal to conduct inhumane ovariectomy procedures to sterilize

wild mares in a manner that would restrict public access to these gruesome wild horse

management techniques. *See, e.g.*, *Kathrens v. Bernhardt*, 505 F. Supp. 3d 1085, 1089 (D. Or.

2020) (Mosman, J.) (explaining that the court "granted a preliminary injunction, enjoining

Defendants from undertaking the sterilization experiments until further order from the Court,"

specifically ruling "for Plaintiffs on their First Amendment claim and their APA claim that

BLM's failure to explain why it was not assessing the social acceptability of its procedures was

arbitrary and capricious").

10.     The Cloud Foundation also provides valuable newsgathering and public oversight

and education functions related to wild horses and BLM's management of wild horses. For

Complaint – 4

example, The Cloud Foundation uses education, media events, videos, blogs, social media, and its website to inform the public about these matters and to garner public involvement to advocate for the interests of wild horses, including before federal, state, and local entities. Because The Cloud Foundation was founded by, and continues to be served by Board President, Ginger Kathrens—an Emmy-award-winning filmmaker—newsgathering and public education is a core priority of the organization's mission.

11.     For over 20 years, the Cloud Foundation has continued this important newsgathering and public information dissemination in its efforts to oppose BLM's current wild horse helicopter roundup practices. For instance, The Cloud Foundation has posted on its website numerous submissions of the organization's previous comments to BLM requesting better access through strategically placed cameras, which have been reposted on the internet and on social media by many other organizations and individuals.

12.     Due to the lack of lawfully adequate access to observe BLM's roundup activities despite the existence of readily available alternatives that would greatly enhance access, the Cloud Foundation has been forced to expend significant resources countering BLM's violations of the First Amendment, NEPA, and the APA in the context of public access of roundups and related management techniques. Because these resources otherwise would have been spent on other organizational priorities, this substantial drain on the organization's resources both harms the organization and frustrates its core mission by diverting limited resources from other key aspects of The Cloud Foundation's mission.

13.     BLM's restrictions on access to observe and document the agency's helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs impair The Cloud Foundation's ability to observe and document this government activity, effectively impeding The

Cloud Foundation's ability to perform its important newsgathering and information dissemination functions. These restrictions also impair The Cloud Foundation's ability to advocate for the humane, responsible, and transparent management of wild horses.



Representative photograph (taken by Plaintiff Ms. Bolbol) of a distant trap site (identified by the red box) as viewed from BLM-designated public viewing area.



Representative photograph (taken by Plaintiff Ms. Bolbol) of a helicopter roundup in the distance as viewed from BLM-designated public viewing area.

14.    Because of the severe public access restrictions BLM will use during its helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs despite

readily available options for enhancing transparency, The Cloud Foundation submitted extremely detailed comments in response to BLM's draft Environmental Assessment ("EA") for the Wild Horse Population Management Plan for these two HMAs. Among much other evidence, The Cloud Foundation included declarations from Plaintiffs Ginger Kathrens and Deniz Bolbol explaining the inherent problems with the severely limited public access provided by BLM and requesting adoption of reasonable alternatives that would greatly enhance public access, while serving all of BLM's stated rationales for its prior limitations on public access. In addition, The Cloud Foundation supplied a thorough explanation of the technical details and specifications for unobtrusive, low-cost, high-definition cameras that, based on the consultation of experts and The Cloud Foundation's long-standing knowledge and expertise in newsgathering and filmmaking activities, would promote and significantly enhance public oversight of wild horse roundup and removal operations.

15.     Despite the substantial effort that The Cloud Foundation exerted by gathering and filing its voluminous evidentiary submission with BLM, the agency did not substantially respond to the substantive information that the organization provided. Rather, in cursory fashion, the agency brushed aside The Cloud Foundation's comments and refused to consider any reasonable alternatives for enhanced public access. Nor did the agency respond to the many substantive points raised by The Cloud Foundation or Plaintiffs Kathrens and Bolbol, which had specifically identified BLM's severe restrictions on public access and the availability and ease of adopting alternative forms of public access that would serve both the public's interest in observing these roundups and BLM's interests in ensuring the safety of everyone involved.

16.     The Cloud Foundation's members and supporters, including Ms. Bolbol, use and enjoy the Three Fingers and Jackies Butte HMAs for a variety of purposes, including hiking,

viewing and photographing scenery and wildlife (including wild horses), and engaging in other vocational, scientific, and recreational activities. The organization's members and supporters— including Ms. Bolbol—have visited both HMAs in 2023, and intend to, and have plans to, continue to use and enjoy these frequently and on an ongoing basis in the future.

17.    The organizational, health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of The Cloud Foundation and its members and supporters have been and will continue to be adversely affected and irreparably injured if BLM's ongoing violations of the First Amendment, NEPA, and the APA continue. A court order declaring BLM's restrictions on public access unconstitutional or otherwise arbitrary and capricious and requiring BLM to use real-time cameras to observe and record helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs—or at minimum to remand to the agency to provide non-arbitrary reasons for refusing to allow this readily available, cost-effective technology to afford Plaintiffs adequate access to observe roundup and removal operations— would protect The Cloud Foundation's (and its members' and supporters') First Amendment rights and its procedural rights afforded by NEPA and the APA.

18.    Plaintiff Ginger Kathrens is the Founder and Board President of The Cloud Foundation. She previously served for many years as the organization's Executive Director. Ms. Kathrens is also a long-standing wild horse advocate and an Emmy-award-winning director of a series of documentaries on the life of a wild stallion named Cloud, which has greatly increased the public's knowledge of wild horses and the public's interest in preserving wild horses. Ms. Kathrens has also filmed and produced other documentaries and short subjects on Cloud's life. She has also written, edited, and produced over two dozen segments of the "Wild America" series on PBS, and has filmed for National Geographic, The Discovery Channel, Animal Planet,

and the BBC. Ms. Kathrens is considered the preeminent documentarian and filmmaker on wild

horse issues in North America. Indeed, her documentary series on Cloud represents the only

continuing chronicle of a wild animal from birth in the northern hemisphere, and PBS has

compared Ms. Kathrens' "revealing journey with wild horses . . . to Jane Goodall's experiences

with chimpanzees." Ms. Kathrens has extensive knowledge of the technical, financial, and

logistical feasibility of using high-definition cameras to film wild horse activities.

19.     In March 2016, BLM appointed Ms. Kathrens to serve on the National Wild

Horse and Burro Advisory Board in the capacity of Humane Advocacy. By appointing Ms.

Kathrens to serve on the Advisory Board in the role of Humane Advocacy, BLM acknowledged

that she has special knowledge and expertise about wild horse protection.

20.     In its announcement of Ms. Kathrens' appointment, BLM described her long-

standing advocacy for wild horses and her role in increasing public awareness of wild horse

issues, noting that "[h]er first Cloud film was voted the most popular documentary in the 25-year

history of the Nature series on PBS." *See* BLM, *BLM Announces Three Selections for National*

*Wild Horse and Burro Advisory Board*, available at https://www.blm.gov/press-release/blm-

announces-three-selections-national-wild-horse-and-burro-advisory-board (last visited Aug. 5,

2023).

21.     As the preeminent filmmaker on the topic of wild horses and due to her extensive

connection to cable networks and contacts in the film industry, Ms. Kathrens plays a vitally

important role in gathering and disseminating information about wild horse issues and in

promoting responsible and humane behavior by BLM—a role the agency itself acknowledged

when previously seeking her participation on its Advisory Board.

22.     BLM's restrictions on access to observe and document BLM's helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs impair Ms. Kathrens' ability to perform her important newsgathering and information dissemination functions, thus infringing upon her First Amendment rights and impairing her ability to advocate for the humane, responsible, and transparent management of wild horses. These restrictions also impair Ms. Kathrens' ability to advocate for the humane, responsible, and transparent management of wild horses in her current capacity as Board President of the organization.

23.     As part of The Cloud Foundation's detailed comments and submission of evidence in response to BLM's draft EA, Ms. Kathrens provided a detailed declaration raising concerns with the type of severely limited public access ultimately adopted by BLM for the Three Fingers and Jackies Butte HMAs, and offering her expert views and opinions on reasonable alternatives that would significantly enhance public access consistent with the dictates of the First Amendment. BLM did not analyze the feasibility of the alternatives presented, nor did it meaningfully respond to Ms. Kathrens' declaration.

24.     A court order declaring BLM's restrictions on public access unconstitutional or otherwise arbitrary and capricious and requiring BLM to allow real-time cameras to observe and record helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs—or at minimum to remand to the agency to provide on remand non-arbitrary reasons for refusing to allow this readily available, cost-effective technology to afford Plaintiffs adequate access to observe roundups—would protect Ms. Kathrens' First Amendment rights and her procedural rights afforded by NEPA and the APA.

25.     Plaintiff Deniz Bolbol is the Director of Advocacy for The Cloud Foundation and has worked for over 14 years to advocate for humane wild horse management, develop humane

fertility control programs, and to gather and disseminate information about wild horse roundups to the general public, as well as federal lawmakers. Among her other duties, she works to increase public understanding of how our government manages wild horses and burros, prepares regular e-newsletters to organizational supporters, creates action alerts that inform the public and our supporters of government actions and how they can participate in the public comments process, and provides support and direction to advocates who attend roundups.

26.    Ms. Bolbol has visited dozens of wild horse HMAs throughout the West, and has personally observed many wild horse roundup and removal operations over the last fourteen years. She has submitted declarations and testimony in several federal lawsuits both explaining her expertise as a long-standing observer of wild horse roundups and raising serious concerns with the severely limited public access BLM ordinarily affords Ms. Bolbol and other members of the public during roundups and their aftermath. Despite BLM's sharp limitations on public access that often restrict the ability to effectively document the roundups and any inhumane treatment that occurs, Ms. Bolbol regularly employs video documentation as one her most effective outreach strategies to increase transparency surrounding wild horse roundups. Her videos have been used by media, disseminated to the public through social media, used to educate members of Congress of BLM actions, and have on at least one occasion been used by BLM itself to address inhumane treatment of wild horses.

27.    BLM's restrictions on access to observe and document BLM's helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs impair Ms. Bolbol's ability to perform her important newsgathering and information dissemination functions, thus infringing upon her First Amendment rights and impairing her ability to advocate for the humane, responsible, and transparent management of wild horses. These restrictions also impair

Ms. Bolbol's ability to advocate for the humane, responsible, and transparent management of wild horses both in her personal capacity as a wild horse advocate and in her capacity as the Director of Advocacy for The Cloud Foundation.

28.     As part of The Cloud Foundation's detailed comments and submission of evidence in response to BLM's draft EA, Ms. Bolbol provided a detailed declaration raising concerns with the type of severely limited public access ultimately adopted by BLM for the Three Fingers and Jackies Butte HMAs, and offering her expert views and opinions on reasonable alternatives that would significantly enhance public access consistent with the dictates of the First Amendment. BLM did not analyze the feasibility of the alternatives presented, nor did it meaningfully respond to Ms. Bolbol's declaration.

29.     A court order declaring BLM's restrictions on public access unconstitutional or otherwise arbitrary and capricious and requiring BLM to allow real-time cameras to observe and record helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs—or at minimum to remand to the agency to provide on remand non-arbitrary reasons for refusing to allow this readily available, cost-effective technology to afford Plaintiffs adequate access to observe roundups—would protect Ms. Bolbol's First Amendment rights and her procedural rights afforded by NEPA and the APA.

30.     Defendant Deb Haaland is the Secretary of the Department of the Interior, the parent agency of BLM, and is thus responsible for BLM's decision to restrict access to the use of cameras for helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs.

Complaint – 12

31.    Defendant Tracy Stone-Manning is the Director of BLM and is thus responsible for BLM's decision to restrict access to the use of cameras for helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs.

32.    Defendant Barry Bushue is the State Manager for BLM in Oregon. Mr. Bushue is responsible for BLM's decision to restrict access to the use of cameras for helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs.

33.    Defendant Wayne Monger is the District Manager for BLM's Vale District Office. Mr. Monger is responsible for BLM's decision to restrict access to the use of cameras for helicopter roundup and removal operations in the Three Fingers and Jackies Butte HMAs.

**LEGAL BACKGROUND**

### I.    First Amendment

34.    The First Amendment to the Constitution of the United States protects the freedom of the press. Although the First Amendment does not enumerate a specific right to observe government activities, the Supreme Court has recognized that the First Amendment does protect newsgathering. To protect this right, the Supreme Court has long recognized a qualified right of access for the press and public to observe government activities.

35.    Open government and a free press are hallmarks of our democracy, and therefore public observation and newsgathering of government actions, such as BLM's wild horse roundups (also referred to by BLM as "gathers"), are essential to government accountability. When a government activity has historically been open to the press and public and the public has played a significant positive role in the functioning of that government activity, the government may impose only such restrictions as are narrowly tailored to serve an overriding government interest.

Complaint – 13

36.     The Ninth Circuit has held that this qualified right of access for the press and public to observe government activities applies directly to wild horse management activities such as wild horse roundups. *See Leigh v. Salazar*, 677 F.3d 892, 899-90 (9th Cir. 2012).

**II.     The Wild Free-Roaming Horses and Burros Act[1]**

37.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the Wild Free-Roaming Horses and Burros Act ("WHA") in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

38.     The WHA provides that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* In delineating areas for wild horse use, BLM "shall consider the appropriate management level for the herd, the habitat needs of the animals, [and] the relationships with other uses of the public and adjacent private lands." 43 C.F.R. § 4710.3-1. The appropriate management level ("AML") is "expressed as a population range within which [wild horses] can be managed for the long term." *See* BLM Handbook H-4700-1, at 4.2.1; 16 U.S.C. § 1331(b)(1) (authorizing BLM to determine AMLs).

39.     The WHA establishes rigorous procedures that BLM must follow in managing wild horse populations, and states that "[a]ll management activities shall be at the minimum feasible level." 16 U.S.C. § 1333(a).

---

[1] Although Plaintiffs are not seeking relief directly under the WHA, they present this outline of its provisions because it provides the legal context in which Defendants are undertaking the activities described in this Complaint.

40.     The WHA embodies Congress's intent that wild horses be treated humanely. For example, in any roundup of wild horses, BLM must ensure that horses are "humanely captured and removed" from the range. *Id.* § 1333(b)(2)(iv)(B). One of the original sponsors of the WHA described the law as an act of "a humane and concerned Government, concerned with protecting our Nation's wildlife and our national heritage."

41.     Since the 1971 enactment of the WHA, BLM's wild horse roundups and removal operations have ordinarily been open to public.

**III.     National Environmental Policy Act**

42.     Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

43.     NEPA is intended "to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process" and it "establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C.F.R. § 1500.1(a).

44.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, see 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies" to effectuate this purpose. *Id.* § 1500.3(a). NEPA regulations are "intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies." *Id.* § 1500.1(b).

45.      To this end, NEPA requires federal agencies to prepare a "detailed statement"—
i.e., an EIS—for all "major federal actions significantly affecting the quality of the human
environment." 42 U.S.C. § 4332(C).

46.      If an agency determines that a proposed action is either "not likely to have
significant effects or when the significance of the effects is unknown," the agency shall instead
prepare an environmental assessment ("EA")." 40 C.F.R. § 1501.5; *see also* 42 U.S.C. §
4336(b)(2). The EA shall "[b]riefly provide sufficient evidence and analysis for determining
whether to prepare an environmental impact statement or a finding of no significant impact" and
also "[b]riefly discuss the purpose and need for the proposed action, alternatives as required by
section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and
alternatives, and include a listing of agencies and persons consulted." 40 C.F.R. § 1501.5(c)(1)-
(2).

47.      If the agency determines on the basis of the EA that the proposed action will not
have significant environmental effects and thus an EIS is not needed, it must prepare a finding of
no significant impact ("FONSI"), which shall either include the EA or incorporate it by
reference. 40 C.F.R. § 1501.6.

48.      Regardless of whether an agency prepares an EIS or an EA, public participation in
agency decisionmaking, including public input into the development of reasonable alternatives to
the action, is central to NEPA's statutory and regulatory scheme. The CEQ regulations require
that federal agencies "[m]ake diligent efforts to involve the public in preparing and
implementing their NEPA procedures," and "[p]rovide public notice of NEPA-related hearings,
public meetings, and other opportunities for public involvement, and the availability
of environmental documents so as to inform those persons and agencies who may be interested

or affected by their proposed actions." 40 C.F.R. § 1506.6. Likewise, once the public has

provided its views by submitting comments, a critical component of the NEPA process is the

requirement for an agency to consider and respond to substantive comments by "[m]odifying

alternatives including the proposed action," "[d]eveloping and evaluating alternatives not

previously given serious consideration by the agency," "[s]upplementing, improving, or

modifying its analyses," "[m]aking factual corrections," and/or "[e]xplaining why the comments

do not warrant further agency response." *Id.* § 1503.4(a).

## IV.    Administrative Procedure Act

49.    Under the APA, a court "shall . . . hold unlawful and set aside agency action,

findings, and conclusions of law found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law . . ." or decisions that are issued "without observance of

procedure required by law." 5 U.S.C. § 706(2)(A), (D).

50.    Agency action is arbitrary and capricious "if the agency has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1981).

## FACTUAL BACKGROUND

## I.    Robust Public Interest in Wild Horse Roundups

51.    BLM's management of wild horse populations is a matter of intense public

interest and consistent coverage in the news media. Although it also uses other techniques such

as temporary immunocontraception and several experimental forms of permanent sterilization to suppress wild horse population growth, BLM generally manages wild horse populations by rounding up and removing "excess" wild horses from the public range when it determines that "an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2).

52.      Wild horse roundups and removal operations—including post-roundup activities in short-term holding pens—have historically been open to public and media observation and often receive coverage in local and national news, as well as the attention of Congress. The following photographs (taken by Ms. Bolbol) provide a representative example of a helicopter wild horse roundup on BLM land, as well as representative examples of the trap sites and temporary pens where horses are held after roundups:



Representative photograph (copyright by The Cloud Foundation) of a helicopter roundup.



Representative photograph (taken by Plaintiff Deniz Bolbol) of a trap site.



Representative photograph (taken by Plaintiff Deniz Bolbol) of a temporary holding pen.

53.     As described more thoroughly above, Plaintiffs have a long history of gathering

and disseminating information about federally protected wild horses and BLM's management of

wild horse populations (including through helicopter roundup and removal operations), and a

proven record of promoting the interests of wild horse populations, educating the public about

wild horses, and successfully advocating for their humane treatment.

54.     With regard to wild horse roundups, which are the means by which BLM has

principally managed wild horse populations, BLM has a nationwide policy promoting "safe and

transparent visitation by the public/media at [wild horse] gather operations, while ensuring the

humane treatment of wild horses and burros." BLM Instruction Memorandum ("IM") 2013-058.

Under this policy, BLM states that agency staff "should work to ensure that the public/media

have opportunities to safely observe gather activities at the trap site and temporary holding

facilities when practicable" and "should also work to ensure that gather safety is maintained at

all times and that the public/media's presence at the gather is successful." *Id*.

## II.    BLM's Proposed Three Fingers and Jackies Butte Roundups

55.    The Three Fingers HMA consists of 62,508 acres of public land in Malheur

County, Oregon, with an AML of 75-150 wild horses in order to maintain what BLM determines

to be a "thriving natural ecological balance." Draft EA at 1. The agency estimated that as of

summer 2022 the wild horse population in the Three Fingers HMA would be over 280 adult wild

horses. *Id.*

56.    The Jackies Butte HMA consists of 65,211 acres of public land in the Dry Creek

Pasture of the Jackies Butte Summer Allotment in Malheur County, Oregon, with an AML of 75-

100 wild horses. *Id.* The agency estimated that as of summer 2022 the wild horse population in

the Jackies Butte HMA would be over 200 adult wild horses. *Id.* at 2.

57.    In the spring of 2022, BLM proposed a 10-year plan to conduct several wild horse

roundups ("gathers") over the course of a decade in order to remove "excess" horses and

implement fertility control measures on wild horses from the Three Fingers and Jackies Butte

HMAs. *See* Draft EA at 1.

58.    The stated purpose for these roundups was "to return the wild horse herds to

levels that are within the established AML in both the Three Fingers and Jackies Butte HMAs"

and "to maintain the herds within those levels, to protect rangeland resources from deterioration

associated with overpopulation, and to restore a natural ecological balance and multiple use

relationship." *Id.* at 2. The stated need was "to achieve a thriving natural ecological balance on public lands," as well as meet other rangeland health objectives. *Id.*

59.     The agency proposed to use various methods of gathering and removal (including helicopter drive trapping, bait/water trapping, and horseback drive trapping) but stated in the proposed alternative that "roughly 90 percent of the estimated herd sizes based on current estimates, would be gathered using the helicopter-drive method." Draft EA at 1, 8.

60.     With regard to managing the intense public interest surrounding these controversial roundups, BLM stated only that "[p]ublic and media management during gather and bait trapping operations would be conducted in accordance with [BLM wild horse policy] WO IM 2013-058 (Wild Horse and Burro Gathers: Public and Media Management)," which "establishes policy and procedures for safe and transparent visitation by the public and media at WH&B gather operations, while ensuring the humane treatment of wild horses and burros." *Id.* at 5.

61.     BLM policy, in turn, sets forth the agency policy that "[t]he public/media are prohibited from riding or placing equipment in the helicopters contracted for gather"; "[t]he National Gather Contract § 3.1.i specifies that 'No cameras, including video cameras will be placed on the Contractor's drive trapping equipment.'" BLM IM 2013-058

62.     In the proposed alternative, Alternative 1, BLM would manage the wild horse populations in these HMAs with both removals and intensive fertility control treatments over a ten-year time frame, which would "most likely include one to three gather operations in each of the HMAs." *Id.* at 6. Again, "roughly 90 percent of the estimated herd sizes . . . would be gathered using the helicopter-drive method." *Id.* at 8. Each helicopter roundup "would take approximately one week or less" with the goal of leaving only 75 wild horses in each of the

Three Fingers and Jackies Butte HMAs, respectively, at the completion of the roundup and fertility control operations. *Id.* at 7-8.

63.     With regard to the fertility control methods employed, the agency stated that "[a]dapative management would be employed that incorporates the use of the most promising methods of fertility control; for example: a fertility control vaccine would be used in the initial gather but may be substituted as advancements are made with safe but more effective and longer lasting fertility control treatments and methods." *Id.* at 9.

64.     Alternative 2 would employ the same roundup and removal of wild horses as Alternative 1, but would also include returning sterile horses among those animals returned to the range, "composed of not more than 50% of each herd," in order to "reduce population growth rates for a longer duration . . . and extend the duration between gathers." *Id.* at 10.

65.     Alternative 3 would employ only intensive fertility control operations and no roundup and removal operation, whereas Alternative 4 would include roundup and removal only, with no fertility control treatments. *Id.*

66.     Under the No Action alternative, Alternative 5, no roundup or fertility management operations would be undertaken. BLM made clear its view that the No Action alternative would not achieve the agency's identified purpose and need.

67.     These were the only action alternatives considered by BLM. The agency also listed "issues considered but not analyzed" in Appendix C, but the use of modern-day technology—such as cameras on helicopters, trap sites, and/or holding pens—to support the public's qualified First Amendment right of access was not addressed in any of the action alternatives or among the issues listed as "considered but not analyzed."

### III.    Plaintiffs' Comments on the Draft EA and Request for Real-Time Cameras

68.    Plaintiffs submitted extensive comments and evidence raising serious concerns with the proposed Three Fingers and Jackies Butte wild horse management plan. They explained, among other concerns, that the Draft EA failed to address alternatives consistent with the project purpose and need that would increase transparency during project implementation. Plaintiffs urged greater transparency in order to "improve BLM's management of wild horse and burro populations and reduce adverse impacts from BLM's activities to federally protected animals and reduce adverse impacts to the members of the public who have recreational, emotional, and aesthetic interests in these animals and their welfare." TCF Comment Letter (May 23, 2022) at 25-26 (hereinafter "TCF Comment Letter").

69.    In their extensive comments and accompanying evidentiary materials, Plaintiffs expressed that the public observation opportunities provided at wild horse roundups have been insufficient under the First Amendment and have repeatedly failed to provide a meaningful opportunity to observe all aspects of the trapping, removal, and handling of the animals, specifically: the ability to observe the helicopter drive, clearly see the trap site, and clearly view the wild horses in temporary holding as the wild horses are loaded and sorted. *Id.* at 26.

70.    For example, Plaintiffs explained that The Cloud Foundation staff members have attended many roundups in Oregon and elsewhere where "members of the public have been wrongly and needlessly confined to a viewing area miles away from the trap" or "where trap sites have been obstructed by terrain or vehicles" and thereby made "entirely unviewable." *Id.*

71.    Plaintiff Ginger Kathrens provided a detailed declaration attesting to the consistently poor conditions of BLM's existing viewing opportunities in an attachment accompanying The Cloud Foundation's comments on the Draft EA. *See* TCF Comment Letter,

Attachment 26. Ms. Kathrens stated that she held "deep concerns over the lack of meaningful observation at helicopter roundups. Frequently observation consists only of distant horses running from distant helicopters which makes it difficult to actually see the treatment of the animals by BLM." *Id.* at 3. Specifically, "[t]he public is unable to observe the majority of the helicopter roundup because the helicopter often flies miles away, out of sight. Public observation only begins at the end of the helicopter drive into the trap site, where hills or other obstacles often obstruct viewing of this portion of the government round up activities as well. This is not meaningful observation of these government actions." *Id.*

72.     As a result of this impaired observation, Ms. Kathrens explained that "[t]he public's inability to meaningfully witness and document government activities at roundups . . . irreparably impedes our ability to inform a wider public about the ramifications of these government actions." *Id.* at 4.

73.     Plaintiff Deniz Bolbol also shared these serious concerns in a declaration provided to BLM along with The Cloud Foundation's comments on the Draft EA. Ms. Bolbol detailed experiences at several BLM roundups where viewing sites were located at substantial distances—sometimes as far as 3 miles away—from the trap sites with resulting poor visibility, limited ability to view the trap sites due to geographic features, or in some instances no ability to view the roundup or trap sites at all. *See* TCF Comment Letter, Attachment 27 at 3-4. Ms. Bolbol ultimately concluded that "[b]ased on the lack of meaningful observation at roundups, I decided it is not useful to attend roundups knowing I may spend thousands of dollars to go to a roundup which is in a remote area and never have any meaningful observation." *Id.* at 4.

74.     To address this long history of a lack of meaningful access for public viewing and to more fully support the public's First Amendment right of access, Plaintiffs proposed—

consistent with the purpose and need to return wild horse herds in the Three Fingers and Jackies Butte HMAs to a level within the AML—that BLM install cameras on helicopters and at trap sites and temporary holding pens "to provide meaningful public observation in compliance with First Amendment Rights." *Id.* at 26.

75. Specifically, Plaintiffs requested that BLM consider and analyze an alternative where cameras would provide real-time, high-definition viewing access to the public during roundups by strategically placing these unobtrusive, low-cost cameras on the helicopters, trap sites, and temporary holding pens. *See* TCF Comment Letter at 27 ("Real-time cameras with GPS should be installed on all aircraft and/or helicopters, trap sites and holding pens used in government operations and this video should be live streamed on the internet and made available to the public online."). Based on their intimate knowledge of and expertise in videography involving wild horses, Plaintiffs also provided extensive technical specifications and details on which cameras to use, where and how cameras could be installed in trap sites and holding pens and on helicopters in compliance with Federal Aviation Administration ("FAA") regulations, and how to ensure accurate GPS location tracking and effective live streaming capabilities. *See* TCF Comment Letter, Attachment 28.

76. Plaintiffs explained that incorporating this readily available and cost-effective technology "will dramatically improve the transparency and accountability of roundup operations and enable the American public to observe their government's activities during wild horse roundups, as well as the impacts of that activity on—and treatment of—their wild horses and burros." *Id.* at 27. Specifically, "cameras would allow observers to identify concerns at an early stage of the roundup, thus better allowing BLM to rectify such issues promptly." TCF Comment Letter, Attachment 26 at 4. "Public observation is the best way for the agency to assess

the social acceptability of any given roundup and to assure the public that the horses are being treated in a humane manner"; "[t]his can be achieved with the placement of cameras at strategic points throughout the roundup." *Id.*

77.     Plaintiff The Cloud Foundation also expressly offered to provide "technical and financial assistance, and to ensure safe installation and operation of these real-time cameras," in order to remove any financial or staffing burden that adding cameras might cause. TCF Comment Letter at 27.

78.     The use of real-time cameras was also recommended in a report commissioned by BLM's long-time roundup contractor, Cattoor Livestock Roundup. The report prepared by Mark J. Deesing, Animal Behavior & Facilities Design consultant for Grandin Livestock Handling stated that:

> Video monitoring of animal operations is a good way to ensure humane handling is taking place on a daily basis. Video cameras mounted in helicopters and in the capture and holding pens can also render the activists' videos as simply nothing more than proof that your business 'walks the walk' when it comes to upholding animal welfare standards.

TCF Comment Letter Attachment 25. The report's recommendation is also consistent with the expert opinion of Dr. Temple Grandin—a renowned animal behaviorist and humane livestock handling—who stated in writing:

> To document how the horses are gathered and handled, the entire procedure should be recorded on video so that it can be evaluated by outside experts or viewed by the public. The best way to record the videos is for the helicopters to have GPS equipped cameras. Cameras should also be in the catch corrals AND TEMPORARY HOLDING PENS to video all the handling in the corrals.

TCF Comment Letter Attachment 27, Addendum A. Plaintiffs placed both of these recommendations from recognized experts before BLM in response to its Draft EA.

79.     The benefits of high-definition camera use on helicopters, trap sites, and holding

pens do not just serve the public's right of access. The very reasons BLM has provided in

previous litigation to justify placing public viewing areas at a substantial distance from trap sites

would also be served by the use of unobtrusive, real-time cameras, including: the need to keep

the public far away from trap sites in order to avoid spooking the horses, reducing safety risks to

the public from either the animals themselves or debris picked up by the helicopter's draft, and

minimizing risks to non-essential agency personal who would also be allowed to safely,

accurately, and fully observe the roundup in real-time. In other words, rather than conflict with

BLM's safety objectives, Plaintiffs' proposed alternative would *further* them.

80.     In other aspects of wild horse management, BLM already routinely uses cameras

while conducting activities essential to BLM carrying out its duties under the WHA. For

example, with respect to BLM's survey efforts to inventory and estimate the size of wild horse

and burro populations in order to inform roundup and other management decisions, BLM has a

long-standing policy of encouraging the use of cameras as part of the agency's data collection

process. Indeed, in BLM Instruction Memorandum 2010-057, BLM explained that the most

accurate and "most effective" method for estimating wild horse herd size is the "mark-resight

using photographs" approach, which "should be conducted using a helicopter." IM 2010-057.

The mark-resight survey technique means that "animals seen by one observer are the 'marked'

groups, and those that are also seen by the other observer are 'resighted.'" *Id.* However,

regardless of the survey method used, BLM's "best management practices" require anyone

conducting aerial wild horse population surveys for BLM to "[t]ake a camera" on the aircraft.

The fact that BLM utilizes real-time photography from aircraft in other aspects of its wild horse

management to enhance the accuracy and effectiveness of its activities under the WHA further

demonstrates the feasibility of such methods and the agency's familiarity with them.

**IV.    Final EA and BLM Decision**

81.    There were no substantive changes to the Final EA, despite receiving Plaintiffs'

comments, among many others. *See* Three Fingers and Jackies Butte Herd Management Areas

Wild Horse Population Management Plan Final Environmental Assessment (Jan. 9, 2023)

("Final EA").

82.    Action Alternatives 1-4 and Alternative 5, the No Action alternative, remained

unchanged from the Draft EA to the Final EA. None of the alternatives analyzed in the Final EA

contained any mention of any improvement to either the location of public viewing areas or the

potential use of cameras to allow a less restrictive right of public access to these controversial

roundups, as protected by the First Amendment. *See* Final EA at 9-13.

83.    BLM failed to consider or discuss Plaintiffs' proposed alternative to implement

the use of real-time cameras during the Three Fingers and Jackies Butte HMA helicopter-drive

roundups, let alone provide a narrowly tailored reason in furtherance of an overriding

government objective to restrict public access in this manner. Nor did BLM discuss or

meaningfully address or analyze whether its current public viewing practices adequately meet its

obligations under the First Amendment.

84.    Four days later, on January 13, 2023, BLM published both its FONSI, concluding

that the proposed action would not have significant environmental effects, and its Decision

Record ("DR") adopting Alternative 1.

85.    In addition to failing to incorporate Plaintiffs' request for increased transparency

via the use of real-time cameras, BLM also failed to provide a legally adequate, non-arbitrary

basis for refusing to implement this readily available, cost-effective, unobtrusive technology. In

its DR, BLM provided only an extremely cursory response to Plaintiffs' request for real-time

camera access:

> The comment supporting cameras on aircrafts has been noted, but falls outside the scope of this EA. In accordance with WO IM 2013-058: "The public/media are prohibited from riding or placing equipment in the helicopters contracted for a gather. The National Gather Contract §3.1.i specifies that 'No cameras, including video cameras will be placed on the Contractor's drive trapping equipment.'"

BLM, Decision Record for Three Fingers and Jackies Butte Wild Horse Population Management

Plan (Jan. 13, 2023) at 13. But the agency failed to explain (nor could it) how any informal

agency policy or private contractual arrangement could override Plaintiffs' well-established First

Amendment right to access these activities on public lands.

86.    Similarly, the FONSI, which incorporated the EA by reference, issued by BLM

made no mention of this readily available and accessible technology to protect Plaintiffs' First

Amendment right of access to view these highly controversial wild horse roundups.

### PLAINTIFF'S CLAIMS FOR RELIEF

### Claim 1: Violations of the First Amendment

87.    Plaintiffs hereby incorporate all preceding paragraphs herein by reference.

88.    The First Amendment prohibits any law "abridging the freedom of speech, or of

the press." U.S. Const. Amend. I. Although the First Amendment does not enumerate special

rights for observing government activities, the United States Supreme Court has continually

recognized that newsgathering is an activity protected by the First Amendment. To provide

necessary First Amendment protections, the Supreme Court has recognized a qualified right of

access for the press and public to observe government activities. Wild horse gathers have

historically been and remain open to the press and general public and public access plays a

significant positive role in the function of gather activities. As such, the public has a right of access to gathers upon public lands.

89.     BLM's restriction of public observation of the helicopter roundups, trapping, and holding pens in the Three Fingers and Jackies Butte HMAs impairs the Plaintiffs' ability to observe this important government activity, is not narrowly tailored to serve an overriding government interest, and thus violates the Plaintiffs' rights under the First Amendment.

## Claim 2: Violations of the NEPA and the APA

90.     Plaintiffs hereby incorporate all preceding paragraphs herein by reference.

91.     By failing entirely to consider an important aspect of the problem—the public's qualified First Amendment right of access to observe roundups—BLM violated NEPA, its implementing regulations, and the APA.

92.     By failing to provide any legal or logical basis for its restriction on public observation of the wild horse roundups in the Three Fingers and Jackies Butte HMAs— especially in light of robust evidence before BLM providing less restrictive means of achieving the agency's purported objectives—BLM violated NEPA, its implementing regulations, and the APA.

93.     By failing to consider any alternative providing for the use of real-time cameras to support Plaintiffs' First Amendment right of access to observe and document the wild horse roundup, removal, and temporary holding operations over the next ten years in the Three Fingers and Jackies Butte HMAs, BLM violated NEPA, its implementing regulations, and the APA.

94.     By failing to take a hard look at the asserted lack of meaningful public participation as extensively documented by Plaintiffs in two formal statements accompanying their Draft EA comments, by failing to take a hard look at substantial evidence and expert recommendations calling for the use of cameras, and by failing to analyze or address whether

existing measures are sufficient to satisfy the public's qualified right of access under the First Amendment, BLM violated NEPA, its implementing regulations, and the APA.

95.     By failing to adequately respond to substantive comments by Plaintiffs and others with subject matter expertise on public observation of wild horse roundup, removal, and temporary holding operations and on the technical, financial, and logistical feasibility of using high-definition cameras to film wild horse activities, BLM violated NEPA, its implementing regulations, and the APA.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1.     Declaring that BLM's decision to proceed with the wild horse roundup in the Three Fingers and Jackies Butte HMAs without any attempt to provide adequate public access to observe and document these controversial roundups, or to even explain the agency's decision to restrict access to readily available, cost-effective, real-time cameras, is arbitrary and capricious, not in observance of procedure required by law, and violates NEPA and the APA;

2.     Declaring that Defendant's restriction of public observation of BLM's wild horse roundups in the Three Fingers and Jackies Butte HMAs violates the First Amendment rights of Plaintiffs and is otherwise arbitrary and capricious;

3.     Enjoining BLM from taking any action to implement the helicopter gather plan in the Three Fingers and Jackies Butte HMAs without first providing improved access via real-time cameras for public observation and documentation or, alternatively, supplying a narrowly tailored reason for any restriction on the installation and use of cameras that can survive constitutional scrutiny;

4.     Setting aside the DR, Final EA, and FONSI, and remanding these documents for further decisionmaking;

Complaint – 31

5.     Awarding Plaintiffs their reasonable attorneys' fees and costs in this action; and

6.     Providing any other relief that the Court deems proper.


Respectfully submitted, this date, August 8, 2023,

/s/ David Bahr
David Bahr, OSB No. 901990
davebahr@mindspring.com
BAHR LAW OFFICES, P.C.
1035 ½ Monroe St.
Eugene, OR 97402
Tel: (541) 556-6439

*Local Counsel*

/s/ Jessica F. Townsend
Jessica F. Townsend, TX Bar No. 24066205
*pro hac vice* application forthcoming
(202) 780-7286
jessica@eubankslegal.com

/s/ William S. Eubanks II
William S. Eubanks II, DC Bar No. 987036
*pro hac vice* application forthcoming
(970) 703-6060
bill@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

*Attorneys for Plaintiffs*