TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

LEEANN KIM, (NY Bar 5539705), Trial Attorney
ANTHONY D. ORTIZ (DC Bar 978873), Trial Attorney
Environment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044-7611
Phone: (202) 305-0468
LeeAnn.Kim@usdoj.gov
[Additional contact information below]

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| CLOUD FOUNDATION, a non-profit Colorado Corporation; GINGER KATHRENS; and DENIZ BOLBOL, | Case No.: 2:23-cv-01154-HL |
| Plaintiffs, | FEDERAL DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION [ECF 21] TO FEDERAL DEFENDNANTS' PARTIAL MOTION TO DISMISS |
| v. | |
| DEB HAALAND, Secretary of the Department of the Interior, in her official capacity; TRACY STONE-MANNING, Director of the Bureau of Land Management, in her official capacity; BARRY BUSHUE, State Director of the Oregon-Washington Bureau of Land Management, in his official capacity; and WAYNE MONGER, District Manager of BLM Value District Office, in his official capacity, | |
| Federal Defendants. | |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

    I.    CLAIM TWO AS ALLEGED IN THE COMPLAINT SHOULD BE
        DISMISSED ......................................................................................... 3

        A.    Plaintiffs lack standing................................................................... 5

                1.    Injury:  An impairment of a First Amendment right is not a
                       cognizable injury under NEPA. ....................................... 5

                2.    Causation and Redressability ........................................... 6

        B.    Plaintiffs have failed to state a claim. ........................................... 7

    II.    PLAINTIFFS LACK STANDING FOR THEIR REFORMULATED
        NEPA CLAIM ..................................................................................... 9

        A.    Plaintiffs have not shown injury in fact for their reformulated
             claim............................................................................................ 10

                1.    Plaintiffs have not pled any facts showing a reasonably
                       probable threat of inhumane treatment under BLM's plan........... 10

                *2.*    *Kathrens* is easily distinguishable because it involves
                       different agency actions. .................................................. 13

                3.    Plaintiffs have not shown how BLM's gather plan threatens
                       to harm their aesthetic and recreational interests. ......................... 16

                4.    Injury in fact cannot be based on procedural injury *in vacuo*....... 17

        B.    Plaintiffs have not shown causation or redressability for their
             reformulated claim. ..................................................................... 18

        C.    The Court should deny Plaintiffs leave to amend their complaint
             based on their reformulated claim............................................... 20

    III.    PLAINTIFFS' REFORMULATED CLAIM STILL DOES NOT
        STATE A CLAIM ............................................................................... 21

CONCLUSION.................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Ashley Creek Phosphate Co. v. Norton*,
  420 F.3d 934 (9th Cir. 2005) ................................................................................................ 18

*Baliestreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1988) ................................................................................................ 20

*Citizens for Better Forestry v. U.S. Dep't of Agriculture*,
  341 F.3d 961 (9th Cir. 2003) ................................................................................................ 10

*Douglas County v. Babbitt*,
  48 F.3d 1495 (9th Cir. 1995) ................................................................................................ 19

*Great Basin Resource Watch v. Bureau of Land Management*,
  844 F.3d 1095 (9th Cir. 2016) .............................................................................................. 23

*In Def. of Animals v. U.S. Dep't of the Interior*,
  751 F.3d 1054 (9th Cir. 2014) .............................................................................................. 24

*Inland Empire Waterkeeper v. Corona Clay Co.*,
  17 F.4th 825 (9th Cir. 2021) ................................................................................................ 15

*Kathrens v. Zinke*,
  3:18-cv-01691 (D. Or.) ............................................................................................ 13, 14, 15

*Kootenai Tribe of Idaho v. Veneman*,
  313 F.3d 1094 (9th Cir. 2002) .............................................................................................. 19

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994) ............................................................................................ 21, 22

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................................. 16

*Mollett v. Netflix, Inc.*,
  795 F.3d 1062 (9th Cir. 2015) ................................................................................................ 8

*Navajo Nation v. Dep't of the Interior*,
  876 F.3d 1144 (9th Cir. 2017) .................................................................................... 10, 11, 18

*Oregon Natural Desert Association v. Bureau of Land Management*,
  625 F.3d 1092 (9th Cir. 2010) ................................................................................... 7, 22, 23

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................................................ 5

*SolarEnergy Indus. Assoc. v. Federal Energy Regul. Comm'n*,
   *80 F.*4th 956 (9th Cir. 2023) ............................................................................... 5

*Summers v. Earth Island Institute*,
   555 U.S. 488 (2009) ...................................................................................... 16, 17

*Washington Environmental Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) ............................................................................ 20

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) .............................................................................. 21

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ................................................................. 5, 17, 18, 19

*Wilderness Society, Inc. v. Rey*,
   622 F.3d 1251 (9th Cir. 2010) ....................................................................... 16, 17

**Regulations**

43 C.F.R. § 4720.1 ................................................................................................. 19

43 C.F.R. § 4770.1 ................................................................................................. 19

## <u>INTRODUCTION</u>

Plaintiffs' Complaint asserts two claims based on (1) a violation of the First Amendment and (2) a violation of NEPA and the APA.  Federal Defendants moved to dismiss Claim Two, Mot. to Dismiss ("Mot."), ECF No. 17, because the protected interest that the Complaint alleges is affected by a purported NEPA violation is Plaintiffs' First Amendment right of access, Compl. ¶¶ 90–95, ECF No. 1.  Congress's intent in passing NEPA was that agencies would consider the environmental impacts of their actions, and enable public involvement regarding those considerations, without mandating any particular environmental result.  However, the alleged harm to Plaintiffs' right of access is not an environmental impact and, therefore, falls outside the scope of what BLM is required to consider under NEPA.  NEPA is not the proper vehicle to allege a constitutional violation and demand that BLM consider an unprecedented change to its public access policy for gather activities.  NEPA is simply a procedural statute to ensure informed decisionmaking with respect to an action's impact on the environment.

Accordingly, based on the allegation that BLM failed to account for Plaintiffs' First Amendment right of access in its NEPA analysis, Compl. ¶¶ 90–95, Plaintiffs lack constitutional and prudential standing because their Complaint does not assert an environmental interest and harm that has a causal connection with or is redressable through NEPA.  *See* Mot. 10–13. Plaintiffs also fail to state a claim with respect to Claim 2 because the purported violation of their First Amendment right is not an environmental impact and is not caused by a change in the environment, *see* Mot. 14–16, and use of real-time cameras is not reasonably related to the purpose and need of the agency action, which is to manage the Three Fingers and Jackies Butte Herd Management Areas ("HMAs") horse population within the appropriate management levels ("AMLs"), *see* Mot. 16–18.  Therefore, there is no plausible violation of NEPA alleged by Plaintiffs' Complaint, as set out in Federal Defendants' motion.

Plaintiffs respond that Federal Defendants' motion is predicated on a "material mischaracterization" of Plaintiffs' interests underlying Claim Two because, according to Plaintiffs, an impairment of Plaintiffs' First Amendment claim is not the interest forming the basis of Plaintiffs' NEPA claim. Pls.' Opp. to Defs.' Partial Mot. to Dismiss ("Opp."), ECF No. 21, at 20;[1] *see also id.* at 24 ("false premise"); *id.* at 25 ("at best mistaken and at worst disingenuous"). However, it is Plaintiffs who are recharacterizing their second claim, into one that is premised on injuries relating to the humane treatment of wild horses rather than Plaintiffs' alleged First Amendment rights. *Compare* Opp., ECF No. 21, at 20, 25–26, *with* Compl. ¶¶ 90–95. With this reply, Federal Defendants also respond to Plaintiffs' refashioned claim, although not pled in the Complaint. Even under their new theory of the NEPA claim, Plaintiffs fail to show that they have standing or to state a claim to relief, for the following reasons: *First*, Plaintiffs have failed to state a reasonably probable, concrete harm involving the inhumane treatment of the wild horses in the HMAs. *Second*, there is no more than an attenuated link between whether BLM implements real-time videotaping of gathers and management activities, which is what Plaintiffs ultimately seek, and the treatment of horses. Any inhumane treatment of horses is not fairly traceable to the lack of real-time videorecording, and the existence of real-time videorecording does not mean horses are likely to be treated humanely. *Third*, Plaintiffs fail to establish that NEPA requires BLM to consider real-time videorecording—which is not a form of treatment of wild horses, a mitigation of treatment of wild horses, an environmental impact, a mitigation of an environmental impact, an impact caused by a change in the environment, or reasonably related to the purpose and need of the agency action (which are to remove horses to maintain AML for the Three Fingers and Jackies Butte wild horses). Claim

---

[1]    Because Plaintiffs' opposition brief does not include page numbering, this brief will refer to the page numbering included in the ECF-stamped header.

Two of Plaintiffs' Complaint should therefore be dismissed.

## ARGUMENT

## I.    CLAIM TWO AS ALLEGED IN THE COMPLAINT SHOULD BE DISMISSED

Plaintiffs state that while "an impairment of their First Amendment rights . . . is the basis of Plaintiffs' First Amendment claim (Claim 1), the interests forming the basis for Plaintiffs' NEPA and APA claims (i.e., Claim 2) are different." Opp., ECF No. 21, at 20. Those other interests, according to Plaintiffs, are "tied to . . . ensuring the humane treatment and care of wild horses during its roundup, removal, and holding activities." *Id.*

As an initial matter, Plaintiffs are recharacterizing Claim 2. Their Complaint makes clear that their NEPA claim is based on an impairment of purported First Amendment rights of access:

Claim 2:  Violations of the NEPA and the APA

90.  Plaintiffs hereby incorporate all preceding paragraphs herein by reference.

91.  By failing entirely to consider an important aspect of the problem—*the public's qualified First Amendment right of access to observe roundups*—BLM violated NEPA, its implementing regulations, and the APA.

92.  By failing to provide any legal or logical basis *for its restriction on public observation of the wild horse roundups* in the Three Fingers and Jackies Butte HMAs—especially in light of robust evidence before BLM providing less restrictive means of achieving the agency's purported objectives—BLM violated NEPA, its implementing regulations, and the APA.

93.  By failing to consider any alternatives providing for *the use of real-time cameras to support Plaintiffs' First Amendment right of access to observe and document the wild horse roundup, removal, and temporary holding operations* over the next ten years in the Three Fingers and Jackies Butte HMAs, BLM violated NEPA, its implementing regulations, and the APA.

94.  By failing to take a hard look at the asserted lack of meaningful public participation as extensively documented by Plaintiffs in two formal statements accompanying their Draft EA comments, by failing to take a hard look at substantial evidence and expert recommendations calling for the use of cameras, and by failing to analyze or address whether existing measures are sufficient *to satisfy the public's qualified right of access under the First Amendment*, BLM violated NEPA, its implementing regulations, and the APA.

95.  By failing to adequately respond to substantive comments by Plaintiffs and others with subject matter expertise on public observation of wild horse roundup, removal, and temporary holding operations and *on the technical, financial, and logistical feasibility of using high-definition cameras to film wild horse activities*, BLM violated NEPA, its implementing regulations, and the APA.

Compl. ¶¶ 90–95 (emphases added).  Federal Defendants' characterization of Claim Two is far from "contrived."  Opp., ECF No. 21, at 7.

Although the Complaint asserts that the underlying harm of Plaintiffs' NEPA claim is the impairment to their purported First Amendment right of access, Plaintiffs do not respond to most of Federal Defendants' arguments for why such a claim must be dismissed.  Plaintiffs, instead, rely on a reformulation of their NEPA claim.  *See, e.g.*, Opp., ECF No. 21, at 20, 24 (noting that Federal Defendants incorrectly interpret the NEPA claim to be based on an impairment to First Amendment rights before making arguments based on Plaintiffs' interest in the humane treatment of horses, and general recreational and aesthetic interests in the horses); *see also id.* at 26 (stating Plaintiffs' reformulated NEPA claim, and asserting that "the Court need not decide here whether BLM has an obligation under NEPA to consider how a proposed action might violate the public's constitutional rights; rather, the Court need only find that Plaintiffs have pled classic NEPA claims that are environmental in nature and seek to ensure and enhance the humane treatment (and avoid abuse and mistreatment) of federally protected wildlife.").

Because Plaintiffs have chosen to not respond to most of Federal Defendants' arguments, the court should dismiss Claim Two, as presented in the Complaint, for the reasons set forth in Federal Defendants' opening brief and below.

A.    **Plaintiffs lack standing.**

1.    **Injury:  An impairment of a First Amendment right is not a cognizable injury under NEPA.**

In their opening brief, Federal Defendants explain that Plaintiffs' NEPA claim, which is premised on an injury to Plaintiffs' First Amendment interest, does not meet the injury-in-fact requirement.  *See* Mot. 10–11.  That is because an impairment of a First Amendment right is not the type of interest NEPA is designed to protect.  *See id.*  NEPA is a procedural statute.  *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).  Therefore, to satisfy the injury-in-fact element for a procedural claim brought under NEPA, Plaintiffs must show, among other things, that the "procedures . . . are designed to protect some threatened concrete interest."  *Id.* at 1013 (internal quotation marks omitted).  As pled in the Complaint, the threatened interest is Plaintiffs' First Amendment rights.  NEPA's procedures, however, are designed to protect environmental concerns.  *See id.* at 1004 ("The purpose of NEPA is to insure that the agency has taken a hard look at environmental consequences." (internal quotation marks omitted)).  Plaintiffs therefore have shown no cognizable injury under NEPA.

Federal Defendants' prudential standing analysis further supports this point.  *See* Mot. 12–13.  As the Ninth Circuit has held, as recently as 2023, "[i]n addition to Article III standing, a plaintiff challenging an agency's compliance with NEPA must establish prudential standing by demonstrating that its injury falls within the zone of interests to be protected by the statute," and "to assert a claim under NEPA, a plaintiff must allege injury to the environment."  *Solar Energy Indus. Assoc. v. Federal Energy Regul. Comm'n*, 80 F.4th 956, 990 (9th Cir. 2023) (internal quotation marks omitted).  Plaintiffs cite no case for their argument that prudential

considerations have essentially been eliminated, at least in the NEPA context. *See* Opp., ECF No. 21, at 23–24.

In fact, Plaintiffs do not dispute the legal proposition that a First Amendment injury does not constitute injury for standing purposes for a claim brought under NEPA. *See* Opp., ECF No. 20–25. Instead, Plaintiffs argue that Federal Defendants misconstrue Plaintiffs' NEPA claim, and that their claim is premised on the environmental interest of ensuring the humane treatment and care of wild horses. *Id.* at 20. Federal Defendants address this newly presented claim separately, below. *See infra*, Part II. But Plaintiffs' failure to directly respond to Federal Defendants' principal legal argument underscores that Plaintiffs have no basis to proceed on a NEPA claim based on BLM's purported failure to consider Plaintiffs' First Amendment rights.

## 2. Causation and Redressability

In their opening brief, Federal Defendants also explain why Plaintiffs' NEPA claim fails the causation and redressability requirements of standing. Mot. 11–12. Plaintiffs, therefore, are incorrect when they state that Federal Defendants "do *not* challenge . . . that Plaintiffs' injuries are fairly traceable to BLM's actions, or that a court order vacating the Decision Record and Final EA will redress Plaintiffs' injuries." Opp., ECF No. 21, at 20. Because BLM is not required to consider Plaintiffs' First Amendment rights in its NEPA analysis, BLM's NEPA analysis did not cause, nor can further NEPA analysis redress, the alleged injury. This lack of causation and redressability is evident whether considering NEPA's overall purpose and requirement (to address environmental concerns) or considering the particulars for what NEPA procedures require, such as the reasonableness of the range of alternatives, *see* Mot. 11–12 (cross-referencing Part III, Mot. 14–18).[2]

---

[2]    Plaintiffs assert that, for purposes of standing, the Court must assume that they will prevail on the merits. Opp., ECF No. 21, at 19. Even if the Court decides to disregard those

**B.      Plaintiffs have failed to state a claim.**

In addition, Plaintiffs have failed to state a claim for which relief can be granted.  Mot.

14–18.  Plaintiffs do not dispute Federal Defendants' first argument—that NEPA does not

require BLM to consider the public's First Amendment right of access because it is neither an

environmental impact nor caused by an environmental impact.  Opp., ECF No. 21, at 26.

Plaintiffs respond only by arguing that their claim is actually based on the assertion of an

environmental interest.[3]  Federal Defendants separately address those arguments, below.  *See*

*infra*, Part II.  However, with respect to the NEPA claim as presented in the Complaint, Federal

Defendants' opening brief explains how there is no plausible claim stated because the alleged

First Amendment impact is not an environmental one.  Mot. 14–16.  Plaintiffs do not refute any

of those arguments.

Similarly, Plaintiffs do not dispute anything about the law or principles that Federal

Defendants present that define the reasonableness of alternatives that NEPA requires BLM to

have considered.  Mot. 16–18.  Plaintiffs only add that, according to *Oregon Natural Desert*

*Association v. Bureau of Land Management*, 625 F.3d 1092 (9th Cir. 2010), "the considerations

made relevant by the substantive statute driving the proposed action must be addressed in NEPA

analysis."  Opp., ECF No. 21, at 27.  Therefore, according to Plaintiffs, BLM must consider

alternatives that ensure the humane treatment of wild horses, as required by the Wild Horses Act,

---

aspects of Federal Defendants' causation and redressability arguments which might be
characterized as incorporating merits discussion (*i.e.*, that NEPA does not require BLM to
analyze Plaintiffs' proposal as an alternative), the Court can nevertheless find a lack of standing
and jurisdiction.  The lack of a cognizable injury under NEPA for disregarding purported First
Amendment interests sufficiently supports dismissal.

[3]      *See* Opp., ECF No. 21, at 26 ("Plaintiffs have extensively rebutted this assertion above.
Stated again, Plaintiffs' NEPA claims stem from procedural and environmental injuries to
Plaintiffs' recreational, aesthetic, and other concrete interests in the wild horses of these HMAs,
their humane treatment, and their habitat.").

and to disregard Plaintiffs' real-time videorecording proposal is a violation of NEPA.  Opp., ECF No. 21, at 27–28.  In addition, Plaintiffs argue that because BLM's preliminary EA itself mentioned issues of humane care and treatment of horses, BLM must consider Plaintiffs' real-time videorecording proposal because it "speak[s] *directly* to the issues."  Opp., ECF No. 21, at 28.

The problem with both arguments is that Plaintiffs' proposal to protect its First Amendment interests does *not* directly address the issue of the humane treatment of wild horses. Plaintiffs have not, for example, presented specific considerations or suggestions for how one way of handling or interacting with a horse might be more or less humane than another (let alone how installation of real-time videorecording would facilitate a particular method of handling or interaction).  Including real-time videorecording in various BLM operations simply addresses how Plaintiffs might be able to obtain information about BLM operations.  Furthermore, the reason Plaintiffs give for why real-time videorecording is needed is a general, unspecified, speculative possibility of inhumane treatment that BLM's 10-year population management plan might inflict.  Plaintiffs' proposal, in fact, has very little relevance or helpfulness with respect to BLM's statutory duty to treat wild horses humanely, and has no reasonable relation to the purpose and need of BLM's population management plan.

In summary, Claim Two should be dismissed for "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065–66 (9th Cir. 2015) (internal quotation marks omitted) (affirming dismissal for failure to plead a plausible violation under the relevant statute). Plaintiffs' purported First Amendment right of access and their proposal to protect that right are neither an environmental impact that NEPA requires evaluation of nor reasonably related to the purpose and need of BLM's project.

## II.      PLAINTIFFS LACK STANDING FOR THEIR REFORMULATED NEPA CLAIM

Plaintiffs now recharacterize their NEPA claim to be about protecting their interest "to monitor, ensure, and enhance the humane treatment (and avoid and mitigate abuse and mistreatment) of" the wild horses, Opp., ECF No. 21, at 8, rather than a deprivation of an alleged right to public access and information-gathering.  *See also, e.g.*, *id.* at 26 ("Stated again, Plaintiffs' NEPA claims stem from procedural and environmental injuries to Plaintiffs' recreational, aesthetic, and other concrete interests in the wild horses of these HMAs, their humane treatment, and their habitat."); *id.* (arguing that "the Court need only find that Plaintiffs have pled classic NEPA claims that are environmental in nature and seek to ensure and enhance the humane treatment (and avoid abuse and mistreatment) of federally protected wildlife").  In doing so, Plaintiffs appear to recognize that their alleged First Amendment right of access is not an environmental interest that an agency is required to consider under NEPA, and that they must rely on a different interest for NEPA to be applicable.  *See id.* ("Thus, . . . Plaintiffs have pled quintessential NEPA claims that are environmental in nature[.]").

However, Plaintiffs have no standing to assert this reformulated claim.  Plaintiffs have not pled any facts showing injury—*e.g.*, that it is reasonably probable that the wild horses will be treated inhumanely under BLM's 10-year population management plan for the Three Fingers and Jackies Butte HMAs.  Because Plaintiffs allege only a broad, speculative injury (inhumane treatment, generally), Plaintiffs cannot show that Federal Defendants' actions could cause or redress the unidentified injury.  Furthermore, Plaintiffs specifically fail to show how the lack of videorecording of wild horse gathers causes the (unspecified) inhumane treatment, and how the presence of videorecording would redress that (unspecified) inhumane treatment.  Plaintiffs assert only that videorecording will provide accountability, if inhumane treatment occurs, by allowing Plaintiffs to learn of the inhumane treatment.  Because this contention fails to state any

environmental injury in fact, and because it shows no actual connection between BLM's action

(the 10-year population management plan) and the alleged environmental injury nor how judicial

relief would redress the environmental injury, Plaintiffs have shown no basis for their standing.

    **A.**    **Plaintiffs have not shown injury in fact for their reformulated claim.**

        **1.**    **Plaintiffs have not pled any facts showing a reasonably probable**
                **threat of inhumane treatment under BLM's plan.**

First, Plaintiffs have shown no injury in fact. An injury in fact must be both "concrete

and particularized" and "actual or imminent, not conjectural or hypothetical." *Navajo Nation v.

Dep't of the Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017) (internal quotation marks omitted).

When a plaintiff is alleging a procedural injury (here, injury from a violation of NEPA's

procedural requirements), injury-in-fact can be demonstrated by showing "(i) the agency violated

certain procedural rules, (ii) those rules protect a concrete interest of the plaintiff, and (iii) it is

'reasonably probable' that the challenged action threatens that concrete interest" that is the

ultimate basis of its standing. *Id.* (citing *Citizens for Better Forestry v. U.S. Dep't of Agriculture*,

341 F.3d 961, 969–70 (9th Cir. 2003)).

    Plaintiffs appear to be arguing that their interest is the avoidance of inhumane treatment

of the wild horses, but they have not identified a single detail to show a reasonable probability

that BLM's 10-year population management plan threatens that interest, *i.e.*, threatens to result in

inhumane treatment of the horses in the Three Fingers and Jackies Butte HMAs. In *Navajo

Nation*, the Ninth Circuit recognized the Navajo Nation's unquantified *Winter* water rights were

a concrete interest, but held that the plaintiff could not rely on speculation to establish that those

rights were threatened by the Secretary of the Department of the Interior's adoption of surplus

guidelines. *Id.* at 1158, 1162–63 ("[M]ere speculation or subjective apprehension about future

harm does not support standing." (cleaned up) (internal quotation marks omitted)). The court

rejected the Nation's allegation that the surplus guidelines would impede the Nation's *Winter* water rights given there were "no facts, figures, or data" provided by the plaintiffs as support. *Id.* at 1163–64.  Therefore, the court held that the Nation lacked Article III standing for its NEPA claim.  *Id.* at 1174.

Similarly, the Complaint here provides no specifics about any inhumane treatment of the Three Fingers and Jackies Butte wild horses.  Plaintiffs have pled no facts, figures, or data for why BLM's population management plan has a reasonable probability of resulting in inhumane treatment.  The Complaint raises the issue of the potential for inhumane treatment only in the generalized abstract.[4]  Similarly, Plaintiffs' brief identifies nothing specific about inhumane treatment in the Three Fingers and Jackies Butte HMAs that threatens to occur under the 10-year population management plan.  Plaintiffs argue only that their "concrete interests in the wild horses and their habitat in these HMAs, . . . will be gravely impacted by the helicopter roundup, removal, and holding operations authorized by the Decision Record and Final EA—activities Plaintiffs have repeatedly observed (when viewing is not totally obscured) to cause tremendous stress and inhumane treatment to these federally protected animals."  Opp., ECF No. 21, at 23

---

[4]        *See, e.g.*, Compl. ¶¶ 53 ("As described more thoroughly above, Plaintiffs have a long history of gathering and disseminating information about federally protected wild horses and BLM's management of wild horse populations (including through helicopter roundup and removal operations), and a proven record of promoting the interests of wild horse populations, educating the public about wild horses, and *successfully advocating for their humane treatment.*"(emphasis added)); *id.* ¶ 76 ("Plaintiffs explained that incorporating [videorecording] 'will dramatically improve the transparency and accountability of roundup operations and enable the American public to observe their government's activities during wild horse roundups, as well as the impacts of that activity on—and treatment of—their wild horses and burros.' . . . Specifically, 'cameras would allow observers to *identify concerns* at an early stage of the roundup, thus better *allowing BLM to rectify such issues promptly*.' . . . 'Public observation is the best way for the agency to assess the social acceptability of any given roundup and to assure the public that the horses are being treated *in a humane manner*[.]'" (emphases added)); *id.* ¶ 78 ("Video monitoring of animal operations is a good way to ensure *human handling* is taking place on a daily basis." (emphasis added)).

n.5. Notably, Plaintiffs make no reference to any such allegedly inhumane treatment having previously occurred within the Three Fingers and Jackies Butte HMAs, or even within BLM Oregon more generally. Nor do they describe with specificity any inhumane act, method, treatment, or result that threatens to occur due to BLM's adoption of the 10-year population management plan for these HMAs.[5]

To the extent Plaintiffs' position is that they cannot specify the details of putative inhumane treatment until their proposal for real-time videorecording of the gather, removal, and management of wild horses is implemented, their claim reverts to one that asserts an interest in public access for information-gathering—and Federal Defendants explained in their opening brief why those interests do not support a viable NEPA claim. Such an argument by Plaintiffs,

---

[5]     *See also, e.g.*, Opp. ECF No. 21, at 9–10 (identifying statutory and regulatory provisions that address the humane treatment of horses subject to the Wild Free-Roaming Horses and Burros Act); *id.* at 16 (quoting section 3.2.10 of BLM's environmental assessment ("EA") document at issue in this case, which stated: "As stated in an Office of Inspector General report (2010), fiercely competing interests and highly charged differences of opinion currently exist between BLM and private individuals and organizations concerning the need for wild horse gathers, the methods used to gather, and *whether horses are treated humanely by BLM and its contractors during and after the gathers*." (emphasis added)); *id.* (quoting section 2.1.1 of BLM's EA, which stated: "[BLM's Instruction Memorandum 2013-058] establishes policy and procedures for safe and transparent visitation by the public and media at WH&B gather operations, *while ensuring the humane treatment of wild horses and burros*." (emphasis added)); *id.* (noting that the EA identified the issues of "the social effects of potentially inhumane treatment of wild horses on the affected public and *BLM's duty to ensure the humane treatment of wild horses during and after roundups in these HMAs*" (emphasis added)); *id.* (noting that comments on the EA submitted by Plaintiffs raised the need for "significantly enhanced public observation and monitoring opportunities that would achieve BLM's stated purpose and need, and *do so in a safe, humane manner, that better avoids, minimizes, and mitigates adverse impacts (including inhumane treatment) to wild horses*." (emphasis added)); *id.* (noting that "Plaintiffs explained that absent such opportunities, there will be no mechanism for the public to meaningfully monitor these activities, let alone *to ensure that BLM and its contractors are satisfying BLM's statutory duty to humanely manage wild horses* and hold BLM accountable when it fails to meet this obligation." (emphasis added)); *id.* at 27 ("BLM must examine, as part of its NEPA analysis for roundup, removal, and holding activities, the considerations that the Wild Horse Act makes relevant regarding the *humane treatment of wild horses* during these specific activities." (emphasis added and original emphases omitted)).

that they do not have sufficient knowledge of speculative and conjectural inhumane treatment, would underscore that Plaintiffs have not stated an environmental injury in fact.

> ### 2.    *Kathrens* is easily distinguishable because it involves different agency actions.

This case is different from *Kathrens v. Zinke*, 3:18-cv-01691 (D. Or), a case cited by Plaintiffs in which the court did not address standing.  In fact, *Kathrens* provides a useful contrast that illustrates how Plaintiffs here have not shown an injury in fact in this case.

*Kathrens* involved experimental studies of three permanent sterilization techniques to manage wild horse populations:  ovariectomy via colpotomy, tubal ligation, and hysteroscopically guided laser ablation of the oviduct papilla.  *See* Plaintiffs' Complaint for Declaratory and Injunctive Relief ("*Kathrens* Compl.") ¶ 60, *Kathrens v. Zinke*, 3:18-cv-01691 (D. Or. Sept. 21, 2018), ECF No. 1; *see id.* ¶¶ 54–107.  BLM prepared an EA and a decision record, first in 2016, authorizing the experimental study of the three techniques and then again, in 2018, for an experimental study of ovariectomy via colpotomy.  As alleged in the complaint:

> 62.  Ovariectomy via colpotomy is a highly invasive surgical technique . . . .  The procedure involves literally reaching into a mare's abdominal cavity through an incision in the vaginal wall, blindly and without any tool to visualize the mare's organs, to identify the ovaries by touch and to remove them by severing them with a loop of chain.  The blind nature of this procedure distinguishes it from a similar, but significantly less invasive, "keyhole" procedure that veterinarians perform on domestic mares using a laparoscope that allows them to see what they are doing.

> 63.  The American College of Veterinary Surgeons describes laparoscopic surgery as the best method for ovariectomy and that "with the advent of laparoscopic (keyhole) surgery, all other techniques have become relatively dated" because laparoscopic surgery provides far greater "visualization and access" and is "minimally invasive," especially in comparison to ovariectomy, which involves removing the ovaries "with a crushing-type instrument."  As documented in comment by Plaintiffs on the BLM's 2016 draft EA for these experiments, ovariectomy via colpotomy significantly increases the risk of fatal hemorrhage due to the inadvertent cutting of the horse's arteries or bowels.  Despite comments from Plaintiffs—and even from the United States Cattlemen's Association, an organization representing the livestock industry that is generally very critical of

wild horses—describing the dangers of ovariectomy via colpotomy, and the superior benefits of laparoscopic surgery, the BLM at the time candidly acknowledged that it decided to proceed with this far more invasive procedure due in part to "the increased costs associated with additional equipment" needed for laparoscopic procedures.

. . .

67. Tubal ligation is a surgical procedure that, according to the BLM, although "commonly performed in humans . . . has not been commonly performed on mares." Indeed, the BLM noted in 2016 that "[t]here are no known studies using this technique to permanently sterilize domestic mares." The procedure involves the insertion of a flexible endoscope through an incision in the vaginal wall to allow visualization and severing of a mare's oviducts. The BLM expects to perform tubal ligations on 50 mares, with at least 10–15 mares being pregnant and at least 10–15 being "open" (not pregnant). According to BLM's 2016 EA, this experiment's primary purpose was to assess how effectively this procedure sterilizes mares, rather than to provide an "accurate quantification of severe complicates rates." After the procedure, non-pregnant sterilized mares would have been repeatedly bred with fertile stallions to assess the rate at which they become pregnant. The BLM proposed in 2016 to also study how often tubal ligation of pregnant mares leads to the abortion of foals.

68. As to the third procedure, according to the BLM, "[h]ysteroscopically-guided laser ablation for mare sterilization is not documented as a surgery used in domestic horses." This procedure, which the BLM proposed to perform on up to 50 open (non-pregnant) mares, involves using a hysteroscope to see inside a mare's uterus and guide a laser that will burn the opening to each oviduct, causing scarring that should "prevent normal sperm/egg union with resultant contraception approaching 100 percent success." According to the BLM, "[w]hether the scar damage is sufficient to sterilize the mare permanently is the question that will be resolved by the study."

*Id.* ¶¶ 62–63, 67–68. Concerned about the humane treatment of the horses that would be subject

to these specific sterilization procedures as part of BLM's experimental study, the *Kathrens*

plaintiffs challenged aspects of the agency action, including restrictions on the public's access to

observe the surgeries. *See, e.g.*, Plaintiffs' Memorandum in Support of Their Motion for

Preliminary Injunctive Relief at 8, *Kathrens v. Zinke*, 3:18-cv-01691 (D. Or. Sept. 28, 2018),

ECF No. 7 (noting "the serious welfare concerns associated with performing the procedure"). In

*Kathrens*, the plaintiffs identified specific health risks associated with physically invasive

surgeries that created a reasonable probability that humane treatment of the wild horses was threatened by agency action.

Plaintiffs argue that because *Kathrens* involved an injury in fact, so does this case, but this argument has no logical or factual basis. First, Plaintiffs contend that the court in *Kathrens* found that Plaintiffs "will suffer irreparable harm," which "necessarily requires an injury in fact sufficient to confer standing under Article III." Opp., ECF No. 21, at 23. But the court's irreparable harm analysis was focused on a violation of the First Amendment. Oral Argument, Transcript of Proceedings at 57:25–58:2, *Kathrens v. Zinke*, 3:18-cv-01691 (filed D. Or. Nov. 8, 2018), ECF No. 21 (ruling from the bench on the request for preliminary injunction: "The First Amendment cases tell me that if I've found a denial of access that I should probably almost certainly find irreparable harm."). The fact that a First Amendment claim (for a right of access to horse sterilization procedures) states an injury in fact does not automatically establish an injury in fact for a NEPA claim generally or the NEPA claim specific to this case.[6] Furthermore, contrary to Plaintiffs' assertion that there is "no legal or logical basis for distinguishing this case from *Kathrens* [because] the parties, the claims, and the concrete interests at stake are functionally identical," Opp., ECF No. 21, at 23, the claims, facts, and interests of this case are significantly different from those in *Kathrens*'s. The *Kathrens* plaintiffs' concerns of humane treatment arose from a concrete agency plan to perform specific sterilization procedures on the wild horses with specifically identified health risks, whereas, in this case, Plaintiffs have only alleged a generally vague and speculative possibility of inhumane treatment of the Three Fingers and Jackies Butte horses under the 10-year population management plan.

---

[6]    *See Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 831–32 (9th Cir. 2021) ("Standing is not dispensed in gross, so a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (cleaned up) (internal quotation marks omitted))

General, speculative harm does not satisfy the injury in fact requirement of standing. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992), the Supreme Court noted that "'[s]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." In *Lujan*, the issue was the lack of specifics for when plaintiffs might visit the affected area and animals; nevertheless, the same reasoning applies when there are no specifics alleged for how agency action threatens to harm the area and animals.

### 3. Plaintiffs have not shown how BLM's gather plan threatens to harm their aesthetic and recreational interests.

Plaintiffs' injury-in-fact arguments are somewhat unclear, but Plaintiffs also seem to imply that by the mere fact they have aesthetic and recreational interests in the Three Fingers and Jackies Butte HMAs and horses, they have standing. *See* Opp., ECF No. 21, at 21–22, 24–25. This is incorrect. Plaintiffs' aesthetic and recreational interests do not give rise to an injury in fact under NEPA without any specific allegations as to how BLM's 10-year population management plan threatens to harm those interests.

In *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010), the Ninth Circuit explained that to sustain standing on the basis of an aesthetic and recreational injury, the plaintiff must show that their "recreational or aesthetic interests would be harmed if the project went forward." *Id.* at 1256. To establish injury, it is not enough that a plaintiff shows that they "would use a particular tract of land" which is the source of its aesthetic and recreational value, "but also that the tract is about to be developed by the [agency] in a way that harms plaintiff's recreational interests." *Id.* (cleaned up) (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009)). The Ninth Circuit found that there was "no indication that the [project] . . . [would] impact [plaintiff's] personal recreational or aesthetic interests in the land" and that the

"lack of any linkage between the project and the claimed injury undermines the effort to establish standing." *Id.* 1257.[7,8]

Here, Plaintiffs similarly have not stated any threatened concrete injury to their aesthetic and recreational interests.  To the extent Plaintiffs might argue that such injury is based on the inhumane treatment of the wild horses, such argument is unavailing for the same reasons, discussed above, that Plaintiffs have not pled any injury to their interest in the humane treatment of the wild horses.

### 4.    Injury in fact cannot be based on procedural injury *in vacuo*.

In addition, to the extent Plaintiffs are arguing or implying that a violation of NEPA's procedure, alone, constitutes sufficient injury in fact, that proposition is incorrect.  *See* Opp., ECF No. 21, at 20 ("Plaintiffs allege interests in rectifying BLM's refusal under NEPA and the APA to address and analyze Plaintiffs' comments, evidence, and expert opinions on options for better monitoring and mitigating the adverse effects (including inhumane treatment) suffered by these wild horses during and after roundups.").  As courts have repeatedly held, "a procedural injury alone does not constitute an injury in fact."  *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1016–17; *see also, e.g., Summers v. Earth Island Institute*, 555 U.S. 488, 496–97

---

[7]    Again, the specific factual issue was the lack of specifics for when plaintiffs might visit the affected area, but the reasoning shows why standing is lacking when there are no specifics alleged for how agency action threatens to harm the area or wildlife.  *See Wilderness Soc.*, 622 F.3d at 1256–57.

[8]    The Ninth Circuit's analysis also shows that while geographic nexus is sometimes the shortcut inquiry used to demonstrate threatened concrete interests for purposes of NEPA, geographic nexus will not always comprehensively satisfy the injury-in-fact analysis.  *See Wilderness Soc.*, 622 F.3d at 1256–57 (noting that while a plaintiff's "proximity" to a particular area with an "expressed intention to continue using the land" can often "underwrite an injury-in-fact," nevertheless, more was required where the plaintiff had not shown that the Ash Creek Project "itself, or its results, affected or would affect his aesthetic or recreational interests in the land he intended to use in the future"—i.e., actual injury, not just the existence of interests).

(2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005) ("A free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact.").

In *Navajo Nation*, the Ninth Circuit held that "the plaintiff must assert that the procedural violation could harm an interest specific to it, not an abstract interest in assuring that NEPA's procedural requirements for considering environmental impacts are followed." *Navajo*, 876 F.3d at 1161. And, notwithstanding a "relaxed standard" that a harm is imminent if based on a procedural violation, an injury in fact still "require[d] a likelihood that the challenged action, if ultimately taken, would threaten a plaintiff's interests." *Id.* As already discussed, Plaintiffs have failed to present *any details*—much less a likelihood—that BLM's 10-year population management plan will result in injury to their interest in the humane treatment of the horses or their aesthetic or recreational interests.

### B.    Plaintiffs have not shown causation or redressability for their reformulated claim.

Plaintiffs also have not shown causation or redressability for a NEPA claim that is based on an alleged harm to an interest in humane treatment or to aesthetic and recreational interests. If a plaintiff establishes an injury in fact under NEPA—which Plaintiffs have not done—the causation and redressability requirements are relaxed. *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1013 (noting that they are relaxed because NEPA does not require a substantive outcome, only that the agency consider the environmental calculus in its decision). Nevertheless, both are still requirements.

For causation, "environmental plaintiffs must make some showing of how the agency's

failure to account for environmental consequences affects them, even if the environmental effects might not be realized for many years." *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1013 (internal quotation marks omitted). "[C]ausation need only be established with 'reasonable probability.'" *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1113 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc. v. United States Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (quoting *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 n.6 (9th Cir. 1995)). For redressability, the plaintiff must show that addressing the procedural violation "may redress" the plaintiff's alleged injuries. *Kootenai Tribe of Idaho*, 313 F.3d at 1113.

Causation and redressability are lacking if, as Plaintiffs' brief argues, their NEPA claim is premised on an injury to their interest in the humane treatment of the wild horses. This is because Plaintiffs have not shown a "reasonable probability" that the lack of real-time videorecording of gathers—the option Plaintiffs allege BLM did not adequately consider in their EA—causes inhumane treatment of horses. As Plaintiffs acknowledge, BLM's regulations require BLM to manage the wild horses humanely, regardless of whether the activities are videorecorded. *See* 43 C.F.R. §§ 4720.1(b), 4770.1(a), (f); Opp., ECF No. 21, at 10. Plaintiffs argue that without videorecording, there is "no mechanism . . . to ensure that BLM and its contractors are satisfying BLM's statutory duty to humanely manage wild horses and hold BLM accountable when it fails to meet this obligation," Opp., ECF No. 21, at 16, but such an assertion is very different from asserting or showing that without videorecording the wild horses are likely to be mistreated (even in a hypothetical, general manner as asserted by Plaintiffs—again, which problematically fails to present an injury in fact) in contravention of BLM regulations.

Finally, even if Plaintiffs obtained the relief they sought and BLM were to reconsider the use of real-time videorecording in gathers and other operations, Plaintiffs' asserted injury would not be redressed. Just as the lack of videorecording does not cause inhumane treatment, the

presence of videorecording does not cure inhumane treatment.  Videorecording might provide

information that might ultimately lead to accountability for some (hypothetical, unspecified)

inhumane treatment, if the information is acted upon, and that accountability might result in a

change to some sort of inhumane treatment.  But this tenuous, contingent chain of events cannot

support redressability.  *See Washington Environmental Council v. Bellon*, 732 F.3d 1131, 1146

(9th Cir. 2013) (noting that redressability requires "a substantial likelihood" that the injury will

be redressed by a favorable judicial decision).  The contingent chain instead underscores that the

purpose of Plaintiffs' demand for videorecording is to remedy an interest in information-

gathering (*i.e.*, their purported First Amendment interest), as pled in their Complaint.

> **C.    The Court should deny Plaintiffs leave to amend their complaint based on their reformulated claim.**

In summary, the lack of injury, causation, and redressability is unsurprising because

Plaintiffs are concerned about a completely speculative, unintended event—the inhumane

treatment of the Three Fingers and Jackies Butte horses—as opposed to a future event that the

agency has planned for, which would typically be the focus of a NEPA claim.  Here, BLM is *not*

planning for or intending inhumane treatment of the wild horses, and Plaintiffs have raised no

facts that establish a reasonable probability that specific inhumane treatment will be caused by

BLM in carrying out its population management plan.

Therefore, if Plaintiffs seek leave to amend their complaint to assert, in particular, their

newly formulated NEPA claim (premised on harm to their interests in the humane treatment of

wild horses and general aesthetic and recreational interests) in place of their NEPA claim

(premised on a violation of their purported First Amendment rights) as pled in the Complaint,

that request should be denied.  *See* Opp., ECF No. 21, at 30 n.8.  Plaintiffs' reformulated claim is

inviable for lack of standing.  *See Baliestreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th

Cir. 1988) (noting that leave to amend should be granted if a plaintiff's claim can be rendered viable).

Either Plaintiffs' claim under NEPA is based on BLM's alleged failure to consider the Plaintiffs' ability to gather information, which is a non-environmental impact, or, as their responsive brief now attempts to characterize the claim, it is based on inhumane treatment of horses, which is sheer speculation unsupported by well-pled fact.  Either way, Plaintiffs have failed to establish standing.

## III.    PLAINTIFFS' REFORMULATED CLAIM STILL DOES NOT STATE A CLAIM

Even putting aside standing deficiencies, Plaintiffs fail to state a claim for which relief can be granted.  As Federal Defendants explained in their opening brief, NEPA does not require BLM to consider the use of real-time cameras during gather and holding operations, because real-time videorecording does not reasonably relate to the purpose and need of BLM's 10-year population management plan.  Mot. 16–18.  The purpose of and need for BLM's action is to manage the Three Fingers and Jackies Butte horse populations within the AML, as required by statute.  For reasons discussed, Plaintiffs' contention that its real-time videorecording proposal was an alternative required under NEPA is without merit.  *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("The 'range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project.'" (quoting *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994)); *Laguna Greenbelt*, 42 F.3d at 525 (holding that an "EIS need not consider every conceivable alternative" and the plaintiff's "suggestions [were] not reasonable or obvious").

Although Plaintiffs attempt to reframe the underlying interest as an environmental concern for the humane treatment of the horses, a threat to that environmental concern is speculative.  Therefore, any argument that Plaintiffs' real-time videorecording proposal is related

to BLM's 10-year population management plan because it will ensure humane treatment or prevent inhumane treatment is also speculative. "An EIS need not consider . . . remote and speculative alternatives whose effects cannot be readily ascertained." *Laguna Greenbelt*, 42 F.3d at 525.

*Oregon Natural Desert Association v. Bureau of Land Management*, 625 F.3d 1092 (9th Cir. 2010) ("*ONDA*"), does not hold otherwise. Plaintiffs cite *Oregon Natural Desert Association* for the proposition that because the Wild Free-Roaming Horses and Burros Act requires the humane treatment of wild horses, BLM must consider the humane treatment of wild horses in its EA. Opp., ECF No. 21, at 27. In *Oregon Natural Desert Association*, BLM believed that it had no current duty to inventory or analyze wilderness characteristics for a resource management plan under 43 U.S.C. §§ 1711–12, because it had already done so years ago as part of a wilderness study under § 1782. *ONDA*, 625 F.3d at 1102–03. BLM therefore declined to consider wilderness characteristics in its EIS for a broad resource management plan covering four and a half million acres of rugged, remote land in southeastern Oregon. *Id.* at 1095, 1101. The Ninth Circuit remanded after examining the statutory provisions and finding that the statute specifically contemplates that BLM consider wilderness characteristics in development of its land use plans and address them in its environmental impact statements. *Id.* at 1113. Based on the statutory requirements, the Ninth Circuit held that "BLM's response to ONDA's concern—that it had completed the § 1782 survey and that it had no further duty to inventory or analyze wilderness characteristics as such—was wrong." *Id.* at 1122. In other words, BLM wrongly "disclaimed any general obligations to analyze the impacts of its Plan on wilderness values, or to consider management options for areas with those values." *Id.* at 1103.

With respect to the Three Fingers and Jackies Butte 10-year population management plan and the EA, BLM has never proceeded without recognizing the statutory concern for the humane

treatment of the wild horses or disclaimed humane treatment to be a part of the management of wild horses, as evidenced by its EA.  *See, e.g.*, EA at 8, 20, 22, 24, 29, 92, 93, 104, 137, 145, 146 (discussing whether specific management techniques are humane treatment).  However, unlike the plaintiffs in *ONDA*, Plaintiffs did not raise a genuine issue of humane treatment for BLM to consider.  *See ONDA*, 625 F.3d at 1107 (discussing the plaintiffs' survey of wilderness characteristics of the land as "demonstrate[ing] . . . how wilderness characteristics may have been reestablished in parts of the area covered by the Southeast Oregon Plan.").  Contrary to Plaintiffs' suggestion, there is no statutory consideration that BLM has ignored, and Plaintiffs have not shown otherwise.

With respect to mitigation, Plaintiffs have failed to identify any actual inhumane impacts that their real-time videorecording proposal would mitigate.  Speculative mitigation measures are not required under NEPA.  *See Great Basin Resource Watch v. Bureau of Land Management*, 844 F.3d 1095, 1107 (9th Cir. 2016) ("And though the BLM did not consider any mitigation measures for the potential impact of poor pit-lake water quality on 'future water uses,' it was not required to do so, because the existence of any such users is speculative.").  Therefore, NEPA's general requirement that an agency consider mitigation measures does not turn Plaintiffs' inviable claim in to a viable one, as Plaintiffs argue.  *See* Opp., ECF No. 21, at 29–30.

Plaintiffs also argue that BLM had a duty to address and evaluate Plaintiffs' comments.  Opp., ECF No. 21, at 30.  BLM in fact did address Plaintiffs' comments.  *See* Mot. 8 (summarizing BLM's response).  BLM was not required to explore Plaintiffs' proposal more extensively for how Plaintiffs could monitor BLM's performance for future, speculative inhumane treatment of wild horses, for all the reasons already discussed.  Plaintiffs argue that Federal Defendants have prematurely addressed the merits of Claim Two because Plaintiffs "vigorously dispute that BLM's cursory response and pointing to an informal policy that expired

in 2014 can satisfy the agency's NEPA and APA obligations."  Yet, Plaintiffs have not rebutted

any of the cases Federal Defendants cite, which show that, as a matter of law, Plaintiffs have

insufficiently pled a violation of NEPA.  Moreover, "NEPA does not require federal agencies to

assess[,]  consider[,] and respond to public comments *on an EA* to the same degree as it does for

an EIS."  *In Def. of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1072–73 (9th Cir.

2014) (cleaned up) (internal quotation marks omitted) (holding that "despite the fact that the

BLM did not recite its reasons for relying on the studies cited in the EA as opposed to the studies

cited by the comment, the BLM still performed the 'hard look' required by NEPA.").

## <u>CONCLUSION</u>

Plaintiffs' Complaint fails to establish standing and state a claim on which relief can be

granted under NEPA.  Plaintiffs' opposition brief presents a different claim, but Plaintiffs also

fail to establish standing for this reformulated claim or show that it states a plausible claim for

relief.  If Claim Two of Plaintiffs' Complaint is based on BLM's alleged failure to consider

Plaintiffs' purported right of public access and ability to gather information on BLM's

operations, Plaintiffs are misapplying NEPA.  If Count Two is based on some purported

inhumane treatment of horses, Plaintiffs have failed to allege with any specific facts that show an

injury to their interest and have failed to raise non-speculative issues of humane treatment that

BLM was required to have considered in its NEPA analysis.

For the foregoing reasons, the Court should dismiss Count Two of Plaintiffs' Complaint

with prejudice.

Respectfully submitted this 5th day of January, 2024,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

 /s/ LeeAnn Kim
LEEANN KIM (NY Bar 5539705)
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0468
(202) 305-0275 (facsimile)
LeeAnn.Kim@usdoj.gov

ANTHONY D. ORTIZ (DC Bar 978873)
Trial Attorney
Wildlife & Marine Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-5708
(202) 305-0275 (facsimile)
Anthony.D.Ortiz@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 5th day of January, 2024, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ LeeAnn Kim*
LEEANN KIM
*Attorney for Federal Defendants*